UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON

ANETIA BEAIR,                          )
      Plaintiff                     )          CIVIL ACTION NO. 5:11-420-KKC
                                         )
v.                                     )
                                         )          **OPINION AND ORDER**
SUMMIT POLYMERS,                       )
      Defendant                     )

* * * * * * * * * *

This matter is before the Court on the Defendant's Motion for Summary Judgment (DE 29) and the Plaintiff's Motion for Partial Summary Judgment on her Failure to Accommodate Claim (DE 31).

## I.      Background

The Plaintiff was employed by the Defendant as a production worker from March 24, 1999 until the Defendant fired her on March 15, 2010.  The Defendant is an international manufacturing company that makes automobile components.  (DE 31, Plaintiff's MSJ at 2.)  Throughout her employment, the Plaintiff worked as a production operator, assembling automobile parts. (DE 31, Plaintiff's MSJ at 2.)

The Plaintiff alleges that, during her employment with the Defendant, she suffered from anxiety and depression and she requested that the Defendant accommodate that disability by assigning her to a different shift.

She asserts two claims against the Defendant under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq*. First, she asserts that the Defendant discriminated against her in violation of 42 U.S.C. § 12112(a) by not reasonably accommodating her disability. Second, she asserts that the Defendant retaliated against

her in violation of 42 U.S.C. § 12203(a) by firing her because she requested the reasonable accommodation.

The Defendant moves for summary judgment in its favor on both claims. The Plaintiff moves for summary judgment in her favor on her failure-to-accommodate claim.

## II.       The Failure-to-Accommodate Claim

Under the ADA, as amended by the ADA Amendments Act (ADAAA) of 2008, an employer is "required, absent undue hardship, to provide a reasonable accommodation to an otherwise qualified individual who meets the definition of disability. . . ." 29 C.F.R. § 1630.2(o)(4).

In order to establish a prima facie case of disability discrimination under the ADA for failure to accommodate, the Plaintiff must show that:

> (1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation.

*Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x. 974, 982–83 (6th Cir.2011) (citing *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir.2004)).

There can really be no dispute that the employer had reason to know about the Plaintiff's claimed disability. The Plaintiff submits a Family and Medical Leave Act (FMLA) certification form completed by her health-care provider that states that she has been diagnosed with "major depressive disorder and posttraumatic stress disorder." (DE 34-1.) The form was provided to the Defendant. Nor can there be any dispute that the Plaintiff requested a transfer and the Defendant denied that request.

2

Thus, the dispute at issue on these motions is whether the Plaintiff has presented sufficient evidence that she is disabled within the meaning of the Act; that she is otherwise qualified for the position, with or without reasonable accommodation; and that she requested a *reasonable* accommodation. *See* 42 U.S.C. § 12112(5)(A) (stating that an employer discriminates against an individual with a disability if the employer fails to make a "reasonable accommodation" to the employee's known limitations unless such accommodation "would impose an undue hardship. . . ."); *Kleiber v. Honda of America Mfg.,Inc.*, 485 F.3d 862, 870 (6th Cir. 2007) ("Generally, an ADA plaintiff bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable.") (quotations and citation omitted).

"Once an ADA plaintiff establishes a prima facie case for failure to accommodate, 'the burden shifts to the employer to demonstrate that the employee cannot reasonably be accommodated, because the accommodation would impose an undue hardship on the operation of its programs.'" *Myers v. Cuyahoga County, Ohio*, 182 F. App'x 510, 515-16 (6th Cir. 2006) (citing *DiCarlo*, 358 F.3d at 419).

### A.   The Plaintiff has presented sufficient evidence that she is disabled for purposes of the ADA.

The ADA defines a "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities" of an individual; a record of such impairment; or being regarded as having an impairment. 42 U.S.C. § 12102(1)(A)-(C).  The Act further provides that "a major life activity also includes the operation of a major bodily function, including . . .brain. . . functions." 42 U.S.C. § 12102(2)(B).

The Plaintiff asserts that she was first diagnosed with depression in 1991 by her family doctor who prescribed Prozac.  (DE 31-2, Beair Dep. at 46-47.)  She asserts that in

3

2009, she went to the emergency room for stress, including suicidal thoughts, caused by her job.  (DE 31-2, Beair Dep. at 51-52, 62.)  She testified that she received inpatient treatment for several days at a residential treatment center in Ashland Kentucky called "Pathways." (DE 31-2, Beair Dep. at 62-65.)  She testified that she took the following week off of work.  (DE 31-2, Beair Dep. at 66.)  She testified that, from that point on, she went to Pathways on a regular basis – at first once a week and later, twice a month.  (DE 31-2, Beair Dep. at 66.)  She testified that Pathways prescribed Cymbalta. (DE 31-2, Beair Dep. at 67.)  The Plaintiff submits a Family and Medical Leave Act (FMLA) certification form completed by Pathways that states that she has been diagnosed with "major depressive disorder and posttraumatic stress disorder."  (DE 34-1.)

The Plaintiff asserts that her mental condition substantially limits her "brain function."  She specifically denies that she alleges her mental condition substantially limit her in the major life activity of "working." (DE 34, Response at 15-16.)

The ADA provides that the definition of disability "shall be construed in favor of broad coverage of individuals. . . ."  42 U.S.C. § 12102(4)(A).  In passing the ADAAA, Congress intended to "reinstat[e] a broad scope of protection to be available under the ADA" and to reject the "inappropriately high" standards for interpreting the term "substantially limits" created by two Supreme Court decisions: *Sutton v. United Air Lines*, 527 U.S. 471 (1999) and *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002). ADA Amendments Act of 2008, Pub. L. 110–325, 122. Stat. 3553, § 2 (2008). Congress stated that, as a result of these decisions, "lower courts have incorrectly found in individual cases that people with a range of substantially limiting impairments are not people with disabilities." ADA Amendments Act of 2008, Pub. L. 110–315, § 2(a)(6).

4

Congress specifically rejected *Toyota*'s holding that the terms "substantially" and "major" should be "interpreted strictly to create a demanding standard for qualifying as disabled." ADA Amendments Act of 2008, Pub. L. 110–315, § 2(b)(4). The Act provides that "an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U . S.C. § 12102(4)(D).

The ADAAA implementing regulations provide that the Court should not undertake an extensive analysis in determining whether a plaintiff is "disabled," providing that:

> The primary purpose of the ADAAA is to make it easier for people with disabilities to obtain protection under the ADA. Consistent with the Amendments Act's purpose of reinstating a broad scope of protection under the ADA, the definition of "disability" in this part shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA. The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, *not whether the individual meets the definition of disability. The question of whether an individual meets the definition of disability under this part should not demand extensive analysis.*

29 C.F.R. § 1630.1(c)(4) (emphasis added).

The regulations provide that the "individualized assessment of some types of impairments will, in virtually all cases, result in a determination of coverage. . . ." 29 C.F.R. § 1630.2(j)(3)(ii). The regulations further provide that, with certain specified impairments, "it should be easily concluded that [the impairments] . . . substantially limit the major life activities indicated."   29 C.F.R. § 1630.2(j)(3)(iii). For example, "[d]eafness substantially limits hearing; blindness substantially limits seeing." 29 C.F.R. § 1630.2(j)(3)(iii). More relevant to the Plaintiff's case, the regulations state that the

Court should easily conclude that "major depressive disorder . . . [and] post-traumatic stress disorder . . . substantially limit brain function." 29 C.F.R. § 1630.2(j)(3)(iii).

Again, the Plaintiff has submitted evidence that she has been diagnosed with major depressive disorder and PTSD. The Defendant presents no reason why, in this case, those conditions do not actually limit the Plaintiff's brain function. Nor has the Defendant argued that the Court should not rely on the ADAAA implementing regulations.

Accordingly, the Plaintiff has presented sufficient evidence that she is disabled for purposes of the ADA.

**B.    The Plaintiff has Presented Sufficient Evidence that she is Qualified for the Position.**

Under the ADA regulations, the term "qualified" means "that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position."   29 CFR § 1630.2(m).

The Plaintiff worked as a production worker in the Defendant's Loading and Assembly Departments for approximately a decade. (DE 29-2, Def.'s Mem. at 2.) Her performance evaluation in March 2008 gave her the highest score of "outstanding" for "quality of work," stating that her "performance is always above our standards."  She also received the highest score for "quantity of work," and the evaluation stated, "[h]igh work ethic – can always exceeds needs in a pinch, has often helped out of tough spots."  She received the highest score in 8 of 9 areas with comments like "Give 10K instead of 5K— worth it!"  (DE 33-11, Performance Appraisal, CM-ECF at 2-3.)

The following year, she received the second highest score of "good" in 8 of 10 areas with comments like "quality of work and concern for quality very good;" "excels in quantity of work when parts are available," "knows job & expectations very well," and "requires very little supervision." (DE 33-11, Performance Appraisal at 4-5.)

The Defendant concedes that, "[f]rom the time she was hired until November 2009, [the Plaintiff] was able to perform all the duties, requirements and responsibilities in the job description of a production operator." (DE 29-2, Def.'s Mem. at 3.)   The Defendant states that, in November 2009, however, its sales increased and that, at that point, the Plaintiff was "no longer able to keep up with the required takt time." (DE 29-2, Def.'s Mem. at 3.) The Plaintiff testified that "takt time" is the rate of production required for assembly lines. (DE 29-6, Beair Dep. at 121.) The Defendant cites the Plaintiff's deposition  in which she agrees that she was "able to do all the duties, requirements, and responsibilities" of the production-worker job until November 2009 but that, at that time, she was no longer able to "keep up with rates, the production."  (DE 29-6, Beair Dep. at 120-21.)

This is certainly evidence that the Plaintiff subjectively felt she could not keep up with the rate of production required for her position. But, the Defendant cites no evidence regarding what the essential production rate for the job was.

In *Denczak v. Ford Motor Co.*, 215 F. App'x 442 (6th Cir. 2007), for example, the defendant produced evidence that its production quota was 225 parts per hour and that the plaintiff could weld only 75-95 parts per hour.  *Id*. at 444.  The Sixth Circuit determined that it was "common sense" that an employee who could "satisfy just 35% of the quota comes up short in performing an essential function of the job."  Id. at 445.

The Defendant here does not cite any evidence regarding what the Plaintiff's production quota was or what the Plaintiff's production rate was in November 2009 or at the time that she was terminated.  Nor does it cite any evidence that it reprimanded the Plaintiff for failing to meet production rates.  It alleges that it terminated her for "sexually harassing a co-worker in violation of company policy."  (DE 29-2, Defendant MSJ at 5.) It does not allege that it terminated her because she was not able to keep up with production rates.

The Plaintiff has produced sufficient evidence that she was qualified to perform the job that she had performed for the Defendant for over a decade.  Likewise, however, the Defendant has produced sufficient evidence through the testimony of the Plaintiff that the Plaintiff was not able to "keep up" with the production rates required for the job.

Thus, whether the Plaintiff was qualified to perform the job of production worker is an issue of fact. *See Keith v. County of Oakland*, 703 F.3d 918 (6th Cir. 2013) ("In light of this evidence, we hold that reasonable minds could differ regarding whether Keith is 'otherwise qualified . . . .The district court erred when it decided that Keith's deafness disqualified him from the position as a matter of law.")

    **C.**    **The Plaintiff has produced no evidence that there was a vacant position on the second shift.**

The Plaintiff asserts that, throughout her employment with the Defendant, she worked on the "180L line," which is a line that makes a particular automobile part. The line was referred to as the "hell line." This is because it was difficult on this line to build parts that would pass quality inspection and also because the moldings needed to create the parts built on this line were often unavailable.  This made it difficult for the workers to meet the production rate they were expected to meet. (DE 31-3, M. McCarty Dep. at 8-

9.) Defendant employee Marquita McCarty testified that that the "fixture that [the Plaintiff] was on was a very difficult fixture because it has a lot of scratches on the trim plate. And at that time we were having a lot of trouble in molding with scratches on the trim plate, so a lot of times Anetia had to work over[time]." (DE 31-3, McCarty Dep. at 17.)

The Plaintiff asked her supervisors, Brad Wood and Greg Johnson, to move her to another line that she thought would be less stressful.  Wood and Johnson told her that there was no one else trained to operate her machine.  (DE 31-2, Beair Dep. at 134-35.) Wood then attempted to rotate the first-shift employees to various machines  but that the effort failed. The Plaintiff testified that "everyone's machines kept on stopping because once you're used to running a machine and know its defects and how it runs, it's something you get used to, and switching off like that, it didn't work. He was having a lot of down time." (De 29-6, Beair Dep. at 136-37.)

On December 7, 2009, the Plaintiff submitted a Shift Transfer Request by which she requested a transfer from the first shift to the second. (DE 31-2, Beair Dep. at 138-9; DE 30-7.)

Defendant employee Anthony Hoodlebrink testified that he preferred the first shift to the second shift.  (DE 31-5, Hoodlebrink Dep. at 35.)  He testified that second shift felt "empty" because the supervisor "was never there with us" and there were not "people around."  He testified second shift was "a whole lot quieter" and "a whole lot of less action."  (DE 31-5, Hoodlebrink Dep. at 35.)  McCarty testified that the second shift is "more laid back. . . you don't have management . . . walking around like you do on first."  (DE 31-3, McCarty Dep. at 37.)

The Plaintiff's current supervisor, current manager, and future manager approved the Plaintiff's transfer request. (DE 30-7.) Christie Smallwood, the Defendant's Human Resources Manager, testified that she reviews such requests to see if the employee's seniority is high enough to transfer and the status of the employee's "occurrences," and "conduct warnings." (DE 31-1, Smallwood Dep. at 58.)

Smallwood testified that she denied the Plaintiff's request to transfer shifts because the Plaintiff was on "final warning" for attendance violations. (DE 31-1, Smallwood Dep. at 59, 64; DE 29-2, MSJ at 4.) By letter to Smallwood dated January 14, 2010, the Plaintiff again requested to transfer shifts stating that the reason she was requesting the transfer was "the stress of working on first" shift and the "extra overheads." (DE 31-4.) The Plaintiff testified that the term "overheads" refers to supervisors and that there were more supervisors and managers present on the first shift. (DE 31-2, Beair Dep. at 221-22.) Beair concluded by stating ," I am asking you to consider to accommodate with me, so I can further be a better and productive employee." (DE 31-4.)

"[A] 'reasonable accommodation' under the ADA may include 'reassignment to a *vacant* position.'" *Kleiber*, 485 F.3d at 869 (quoting 42 U.S.C. § 12111(9)(B)). "Consequently, 'an employer has a duty under the ADA to consider transferring a disabled employee who can no longer perform his old job even with accommodation to a new position within the [c]ompany for which that employee is otherwise qualified.'" *Id.* (quoting *Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 257 (6th Cir.2000)). "However, this duty does not require employers 'to create new jobs [or] displace existing employees from their positions . . . in order to accommodate a disabled individual.'" *Id.*

10

The Defendant argues that the Plaintiff's request to be transferred to the second shift was denied because the Defendant had a policy against transferring shifts for an employee on final warning unless there was an opening on the shift. (DE 29-2, Def.'s Mem. at 4.) As evidence of this policy, the Defendant submits certain pages of an "Hourly Team Member Handbook." (DE 30-1, Handbook Excerpts.) The handbook states as follows:

> A team member who has completed 30 days of employment may request a different shift (within the same department and job) by filling out a shift selection form and submitting it to the Human Resources department. . . Higher seniority team members will be allowed to bump lower seniority team members . . . *Team members on FINAL WARNING status are not eligible for shift transfers, unless there is an opening on the desired shift.*

(DE 30-1, Handbook Excerpts) (emphasis added).

Smallwood testified that, when she received the Plaintiff's transfer requests, she made a notation at the top of it that the Plaintiff was on "final warning." (DE 29-7, Smallwood Dep. at 59.) The Plaintiff testified that her supervisors informed her that Smallwood had denied her request because she was on "final warning." (DE 29-6, Pf.'s Dep. at 139.)

The Plaintiff does not dispute that she was on final warning when she requested the transfer. Nor does she dispute that, under the Defendant's policy, the Plaintiff could not be transferred when on final warning unless there were openings on the second shift. She argues, however, that the Defendant has produced no evidence that there were no openings on the second shift. It is true that Smallwood testified that at the time of her deposition she did not remember if there was an opening on the second shift when the Plaintiff requested the transfer. (DE 35-3, Smallwood Dep. at 60.)

It is the *plaintiff's* burden, however, to show that her proposed accommodation was objectively reasonable. *Keith*, 703 F.3d at 927. Thus, where the plaintiff's proposed accommodation is a transfer, it is the plaintiff's burden to show that there was a vacant position. *Coulson v. The Goodyear Tire & Rubber Co.*, 31 F. App'x 851, 857 (6th Cir. 2002) ("Since [the Plaintiff] failed to offer proof that there were currently available positions for which he was qualified, he cannot prevail."); *Kleiber*, 485 F.3d at 870 ("[a]bsent any evidence that Honda continued to hire Production Associates, seek out applicants, or accept applications during the relevant time period, we cannot conclude that a reasonable jury could find that a vacancy existed.")

The Plaintiff does not point to any evidence that demonstrates there was, in fact, a vacant position on the second shift. Discovery is complete but the Plaintiff is unable to produce evidence that, for example, the Defendant was advertising for a position on the second shift, seeking applicants for a position on the second shift or accepting applications for such a position. The Plaintiff produces no testimony from employees that there were fewer people working on the second shift than usual or that the Defendant was, in fact, hiring for the second shift. Nor does she produce any reports showing the number of employees working on the second shift at the time of the Plaintiff's request compared to other time periods.

The Plaintiff cites Smallwood's deposition testimony that she could not remember if there were vacant positions at the time of Smallwood's request. (DE 31-1, Smallwood Dep. at 60.) Without something more, however, no reasonable juror could conclude from this testimony that there were, in fact, vacant positions. The Plaintiff has pointed to no evidence from which a juror could reach that conclusion.

The Plaintiff states that Smallwood testified that, "absent the final warning for attendance issues, [the Plaintiff's] request for a transfer would have been granted." (DE 31, Pf.'s Mem. at 5.) Smallwood did testify that the Plaintiff's shift-transfer was denied solely because she was on final warning. (DE 32-3, Smallwood Dep. at 85.) The Plaintiff seems to be arguing that it can be inferred from this statement that there was, in fact, an opening on the second shift.

But this is not accurate. Again, the Defendant's policy is that employees on final warning cannot be transferred "*unless there is an opening on the desired shift.*" Thus, any statement by Smallwood that the Plaintiff's request was denied because she was on final warning would indicate there was no opening on the second shift. But the opposite is not true. It cannot be inferred from the statement that there was a vacancy on the second shift.

The Plaintiff makes clear on the first page of her Motion for Summary Judgment that the only accommodation at issue is her request to transfer to second shift, stating that the issue on this claim is whether her rights were violated when the Defendant "refused to transfer her from first to second shift." (DE 31, Pf.'s Mem. at 1.) She also states that she "specifically stated that she was requesting a transfer to the second shift as an accommodation. . . ." (DE 31, Pf.'s Mem. at 13.) Because she has produced no evidence from which it can be inferred that there was a vacant position on the second shift, she has failed to produce evidence that her only requested accommodation was reasonable and, thus, her failure-to-accommodate claim fails.

Furthermore, the Plaintiff states that she sought the transfer to the second shift because she believed it "would be less stressful because there were fewer 'overheads' on

second shift." (DE 34, Pf.'s Response at 7; DE 31, Pf.'s Mem. at 4.) Again, when referring to "overheads," the Plaintiff was referring to managers and supervisors. She states that she knew that on second shift "there were fewer management employees walking through the plant and that the shift had a more relaxed feel to it, although the production standards were not lower for employees on that shift." (DE 31, Pf.'s MSJ at 4.)

The Plaintiff specifically denies that the production rate was higher on the first shift or that the second shift had different production standards or goals. (DE 35, Reply at 5.) The Plaintiff asserts that the second shift was "essentially the same work" as the first shift. (DE 35, Reply at 5.) She states that "the position on second shift was the same as the position she held on first shift." (DE 35, Reply at 10.) She testified that both shifts have the same takt time. (DE 29-6, Beair Dep. at 129.)

Less management presence is the only distinction that the Plaintiff makes between the first and second shift. But transferring an employee solely so she will be subjected to less supervision is not a reasonable accommodation. *See Wiggins v. DaVita Tidewater, LLC*, 451 F. Supp.2d 789, 799 (E.D. Va. 2006) (stating that, "[t]o the extent that, in order to accommodate [the plaintiff], [the employer] would have to insure that she would be guarded against stress and criticism from supervisors in general, this type of accommodation is not reasonable . . . .")

The Plaintiff also states that she sought the transfer to "allow her to take advantage of additional treatment options at Pathways." (DE 35, Reply at 12.) She states that the transfer "would permit her to attend workshops at Pathways that occurred during daytime hours . . ." (DE 31, Pf.'s Mem. at 4.) The Plaintiff does not develop this

14

argument. Further, she does not dispute that the Defendant had granted her intermittent FMLA leave that would have covered treatment at Pathways. (DE 30-5, 30-6.) Thus, the transfer was not necessary to permit the Plaintiff to receive treatment at Pathways.

### D.     The Interactive Process

As part of her claim that the Defendant failed to reasonably accommodate her disability, the Plaintiff also claims that the Defendant failed to engage in an interactive process to identify a reasonable accommodation. *See Kleiber*, 485 F.3d at 868 (stating that a claim that an employer failed to engage in the required interactive process addresses the employer's alleged failure to offer a reasonable accommodation).

The ADA's regulations state that "[t]o determine the appropriate reasonable accommodation it may be necessary for [the employer]] to initiate an informative, interactive process with the [employee]." 29 C.F.R. § 1630.2(o)(3). "The purpose of this process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Kleiber*, 485 F.3d at 871 (quoting 29 C.F.R. § 1630.2(o)(3)). "Even though the interactive process is not described in the statute's test, the interactive process is mandatory and both parties have a duty to participate in good faith." *Id.* "When a party obstructs the process or otherwise fails to participate in good faith, courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Id.* (quotations and citation omitted).

In *Kleiber*, the Court noted that "some courts have concluded that a plaintiff-employee must show that a reasonable accommodation would have been possible if the employer is to be liable for conducting the interactive process in bad faith." *Id.* at 872, n. 6. It noted that these courts included the Sixth Circuit in two unpublished decisions. *Id.*

(citing *Breitfelder v.* Leis, 151 F. App'x 379, 380, 386 (6th Cir. 2005); *Clark v. Whirlpool Corp.,* 109 F. App'x 750, 755 (6th Cir. 2004)). *See also Denczak v. Ford Motor Co.*, 215 F. App'x 442, 446 (6th Cir. 2007) ("an employer violates this requirement *only if* . . .the employee can demonstrate that the employee could have been reasonable accommodated but for the employer's lack of good faith.") (quotations and citation omitted).

In *Kleiber*, however, the Sixth Circuit declined to address the issue. After *Kleiber*, the Sixth Circuit again indicated in at least two unpublished cases that the plaintiff must show that a reasonable accommodation was possible for the employer to be liable for failing to engage in the interactive process. *See Lafata v. Church of Christ Home for Aged*, 325 F. App'x 416, 422 (6th Cir. 2009) ("Employers 'who fail to engage in the interactive process in good faith [] face liability [under the ADA] if a reasonable accommodation would have been possible." (quoting *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000)); *Trout v. Aerospace Testing Alliance*, 303 F. App'x 272, 274 n.1 (6th Cir. 2008) ("The Court earlier concluded that Trout failed to establish there was a vacancy for which he was qualified by which to accommodate his disability. Therefore even if ATA did not engage in a good faith interactive process, appellant cannot prevail on this point because Trout would be unable to establish that he could have been accommodated but for ATA's failure to engage in the interactive process.")

In *McBride v. BIC Consumer Products Mfg. Co., Inc.*, 583 F.3d 92 (2nd Cir. 2009), the Second Circuit explained that "the ADA imposes liability for . . . discriminatory refusal to undertake a feasible accommodation, not mere refusal to explore possible accommodations where, in the end, no accommodation was possible." *Id*. at 100. The court further noted that, "each of our sister Circuits to have considered the issue has

concluded that failure to engage in an interactive process does not form the basis of an ADA claim in the absence of evidence that accommodation was possible." *Id.* at 100-01 (citing *Battle v. United Parcel Serv. Inc.*, 438 F. 3d 856, 864 (8th Cir. 2006); *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005); *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 952 (8th Cir. 1999); *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1174 (10th Cir. 1999); *Soto-Ocasio v. Fed. Express Corp.*, 150 F.3d 14, 19 (1st Cir 1998); *Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997); *Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 233-35 (3rd Cir. 2000)).

In line with these decisions, the Second Circuit determined that an employer's failure to engage in the interactive process "does not relieve a plaintiff of her burden of demonstrating, following discovery, that some accommodation of her disability was possible." *Id.* at 101.

In accordance with these decisions and the unpublished decisions of the Sixth Circuit, this Court concludes that, because, after discovery, the Plaintiff has failed to put forth any evidence that there was a vacancy which would accommodate her disability, the Plaintiff cannot prevail on a claim that the Defendant failed to accommodate her disability by failing to engage in the interactive process.

## III.     Retaliation

To establish a prima facie case of retaliation, the Plaintiff must produce evidence that 1) she engaged in protected activity; 2) suffered an adverse employment action; 3) that the protected activity caused the adverse employment action. *Bryson v. Regis Corp.*, 498 F.3d 561, 577 (6th Cir. 2007).  If the Plaintiff establishes a prima facie case of retaliation, then the defendant must produce evidence of a legitimate, non-discriminatory

reason for its adverse action.  *Id.*  The Plaintiff must then produce evidence that the proffered legitimate reason was not the true reason for the adverse employment action, but instead merely a pretext for retaliation. *Id.*

The Plaintiff has produced sufficient evidence that she engaged in a protected activity. The Defendant was aware of the Plaintiff's mental condition. Smallwood testified that she received a letter from the Plaintiff's physician in 2002, stating that Beair had been under treatment for depression and anxiety since 1999 and that her position, at that time, as an "assembler" had caused severe anxiety and destabilization of the Plaintiff's mental condition. (DE 33-5, July 30, 2002 Letter.)  The letter suggests that it would be best for the Defendant and Plaintiff for the Plaintiff to be moved to a different position.  The Defendant accommodated that request.

The Plaintiff's physician wrote another letter to the Defendant on February 3, 2005 stating that the Plaintiff had developed "recurring panic attacks (Agoraphobia) since the number of people has increased her near enclosed cell job."  (DE 33-6, February 3, 2005 letter.)  The physician stated he was writing "to request work accommodations for the above individual to restore her to normal mental status where she can perform her job without duress.  My suggestion is a job cell with no more than 4 individuals in the cell or a more open, less crowded work area."

As discussed, in 2009, the Plaintiff received in-patent treatment for stress and was unable to work for one week because of her mental condition.  Her FMLA certification submitted to the Defendant and dated October 27, 2009 stated that she suffered from major depressive disorder and PTSD. (34-1, FMLA Certification.) Her letter to

Smallwood dated January 14, 2010 stated that she requested a transfer at least in part because of stress.

This is sufficient evidence that the Plaintiff requested that her mental condition be accommodated by a transfer to the second shift.

There is no dispute that the Plaintiff's termination constitutes an adverse employment action.

As to evidence of a causal link between her accommodation request and her termination, the Plaintiff points out that she was terminated approximately two months after her January 14, 2010 letter. Further, she requested the accommodation from Smallwood who also ultimately terminated the Plaintiff.  Under these circumstances, the approximately two-month gap between the protected activity and the termination is sufficient to show a causal connection between the two events.  *See Nicholson v. City of Clarksville, Tenn.,* 2013 WL 3746098, at * 13 (July 17, 2003) (citing *Dye v. Office of Racing Comm'n*, 702 F.3d 286, 306 (6th Cir. 2012)).

This means that the Defendant must produce some evidence that it terminated the Plaintiff for a legitimate reason.  The Defendant has produced evidence that it terminated the Plaintiff because it found that she sexually harassed a co-employee.

Thus, the Plaintiff must produce evidence that the Defendant did not really fire her because it found that she sexually harassed a co-employee. She can do this by producing evidence that 1) the proffered reason has no basis in fact; 2) the proffered reason did not actually motivate the defendant to fire the plaintiff; or 3) the proffered reason was insufficient to motivate the employer's action.  *Harris v. Metro. Govt. of*

*Nashville & Davidson Cnty., Tenn.*, 594 F.3d 476, 485 (6th Cir. 2010) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

As to the first method of showing pretext, the Plaintiff must produce evidence that "the proffered bases for the plaintiff's discharge never happened." *Manzer*, 29 F.3d at 1084. There is no dispute that the Plaintiff's co-employee, Hoodlebrink, filed a complaint alleging that the Plaintiff had sexually harassed him. Nor is there any dispute that the Defendant found that the Plaintiff sexually harassed Hoodlebrink.

The third way to show pretext "ordinarily, consists of evidence that other employees . . . were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Id*. The Plaintiff has produced no evidence of other employees who were not fired after the Defendant found they had sexually harassed a co-employee.

With the second method of showing pretext, "the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal." *Id*. The plaintiff, however, produces circumstantial evidence "which tend[s] to prove that an illegal motivation was *more* likely than that offered by the defendant." *Id*. For this showing, the plaintiff cannot simply rely on prima facie evidence "but must, instead, introduction additional evidence" of discrimination. *Id*.

The Plaintiff has produced evidence that the Defendant's investigation regarding the sexual-harassment complaint against the Plaintiff was a cursory one. Hoodlebrink said he filed a complaint because the Plaintiff said to him, "I want to take you home with me." (DE 29-8, Hoodlebrink Dep. at 69; DE 31-5, Hoodlebrink Dep. at 38.)

His Complaint Form states, "Anita Beair has sexually harassed me on numerous occasions.  She told me she would take advantage of my little ass whether I liked it or not.  She also said she was old enough to be my grandma but age didn't matter to her she would still take advantage of me."  (DE 33-13.)  The Complaint does not state that the Plaintiff stated "I want to take you home with me."

Smallwood testified that she met with Hoodlebrink for a few minutes, then met with some witnesses that Hoodlebrink had identified, and then met with the Plaintiff. (DE 29-7, Smallwood Dep. at 108, 120.)

Smallwood testified that she explained the complaint to the Plaintiff and that the Plaintiff "immediately said Mr. Hoodlebrink's name."  (DE 29-7, Smallwood Dep. at 120.) Smallwood testified that she asked the Plaintiff if she made the comments and that the Plaintiff said she did not. (DE 29-7, Smallwood Dep. at 120.) The Plaintiff wrote "false accusation" on the Employee Warning Record that Smallwood gave her.  (DE 33-3.)  Smallwood testified that she did not ask the Plaintiff for witnesses supporting her denial. (DE 29-7, Smallwood Dep. at 120.)

Smallwood testified that, prior to meeting with the Plaintiff, she had already drafted the paperwork necessary for her termination. (DE 29-7, Smallwood Dep. at 120.) She further testified, however, that "had something been said differently in our meeting with her, we would have at that time said . . . we weren't going to.  We were going to continue the investigation." (DE 29-7, Smallwood Dep. at 120.)

Smallwood testified that the Plaintiff's "statement of immediately saying Mr. Hoodlebrink's name whenever I made the comment to her that she had said explicit statements told us right there that she had done it."  (DE 29-7, Smallwood Dep. at 121.)

This was because, the Plaintiff "immediately knew who we were talking about." (DE 29-7, Smallwood Dep. at 121.)

Smallwood recognized that she had been trained, when investigating a complaint such as this, to contact witnesses identified by both individuals involved. (DE 31-1, Smallwood Dep. at 112.) The Defendant's employee handbook states that, "[g]iven the nature of this type of discrimination[], the company recognizes also that a false allegation of harassment can have serious effects on innocent men and women.  Filing of false complaints will subject the team member to disciplinary action up to and including discharge." (DE 30-1, Employee Handbook at 25.)  The handbook further states that "[t]he company recognizes that the question of whether a particular action or incident is purely a personal, social relationship without discriminatory employment impact requires a factual determination based on all facts and the totality of the circumstances." (DE 30-1, Employee Handbook at 25.)

The fact that Smallwood drew up the paperwork necessary to terminate the Plaintiff prior to meeting with her and that she terminated the Plaintiff without further investigation even though the Plaintiff denied making the comment could lead a reasonable juror to conclude that the Defendant did not actually fire the Plaintiff because it found that she sexually harassed a co-employee.

Further, the Defendant's employee handbook states that "[a]ny supervisor, agent or other team members who has been found, after appropriate investigation by the Company, to have harassed another team member will be subject to appropriate disciplinary action, *up to and including immediate discharge*."  (DE 30-1, Handbook at 24-25) (emphasis added).  This indicates that immediate discharge is not the only action

that the Defendant undertakes in the case of sexual harassment.  There is no evidence that the Defendant  considered any lesser action in the Plaintiff's case.

### IV.    Conclusion.

For all these reasons, the Court hereby ORDERS as follows:

1)    The Defendant's Motion for Summary Judgment (DE 29) is GRANTED in part and DENIED in part as follows:

a)    the Defendant's Motion for Summary Judgment is GRANTED as to the Plaintiff's claim that the Defendant discriminated against her in violation of 42 U.S.C. § 12112(a) by not reasonably accommodating her disability and that claim is DISMISSED;

b)    the Defendant's Motion for Summary Judgment is otherwise DENIED; and

2)    The Plaintiff's Motion for Summary Judgment (DE 31) is DENIED.

Dated this 13th day of August, 2013.



**Signed By:**

**_Karen K. Caldwell_**

**United States District Judge**